**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | | |
|---|---|---|
| **Agile Journeys LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **Civil Action No. _____** |
| **v.** | § | |
| | § | |
| **The Walt Disney Company and** | § | **Jury Trial Demanded** |
| **Walt Disney Parks and Resorts U.S.,** | § | |
| **Inc.,** | § | |
| | § | |
| *Defendants.* | § | |

<u>**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND
FOR A JURY TRIAL**</u>

Plaintiff Agile Journeys LLC files this Original Complaint for patent infringement against Defendants The Walt Disney Company and Walt Disney Parks and Resorts U.S., Inc., alleging as follows:

<u>**NATURE OF THE SUIT**</u>

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

<u>**THE PARTIES**</u>

2.      Plaintiff **Agile Journeys LLC ("Agile Journeys" or "Plaintiff")** is a private limited company organized under the laws of the state of Delaware with an address at P.O. Box 9929, Glendale, California 91226.

3.      Upon information and belief, Defendant **The Walt Disney Company ("TWDC")** is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at Walt Disney Studios, 500 South Buena Vista Street, Burbank, California. TWDC may be served via its registered agent for service, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

4.      Upon information and belief, Defendant **Walt Disney Parks and Resorts U.S., Inc. ("WDPR")** is a corporation organized and existing under the laws of the state of Florida with a principal place of business at 1313 South Harbor Boulevard, Anaheim, California 92802. Upon information and belief, WDPR is a subsidiary of Defendant TWDC and is responsible for the operation of amusement parks, including those located in Florida and California. WDPR may be served via its registered agent for service, Corporation Service Company, at 1201 Hays Street, Tallahassee, Florida 32301-2525.

5.      Defendants TWDC and WDPR are hereinafter collectively referred to as **"Disney," "Defendants,"** or **"Defendant."** The Defendants—along with numerous other entities existing under the Disney corporate umbrella—have in the past and continue to hold themselves out as a single entity—Disney—acting in concert, with knowledge of each other's actions and control over each other.

## JURISDICTION AND VENUE

6.      This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et seq*. This Court's jurisdiction over this action is proper under the above statutes, including 35 U.S.C. § 271, *et seq.*, 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1338 (jurisdiction over patent actions).

7.      Disney is subject to personal jurisdiction in this Court. In particular, this Court has personal jurisdiction over Disney because Disney has engaged in continuous, systematic, and substantial activities within this State, including substantial marketing, offers to sell, and sales of products and services within this State and this District, including operation of Walt Disney World Resort and its related and/or affiliated theme parks, located, *inter alia*, at 3111 World Drive, Lake Buena Vista, Florida 32830; 1180 Seven Seas Drive, Lake Buena Vista, Florida 32830 (Magic Kingdom); 2901 Osceola Parkway, Lake Buena Vista, Florida 32830 (Animal Kingdom); 351 South Studio Drive, Lake Buena Vista, Florida 32830 (Hollywood Studios); 200 Epcot Center Drive, Orlando, Florida 32821 (EPCOT); 1534 Blizzard Beach Drive, Orlando, Florida 32836 (Blizzard Beach); 1143 East Buena Vista Drive, Orlando, Florida 32830 (Typhoon Lagoon); 1468 East Buena Vista Drive, Lake Buena Vista, Florida 32830 (Disney Springs). Upon information and belief, Walt Disney World includes four theme parks (Magic Kingdom, Epcot, Hollywood Studios, Animal Kingdom), two water parks (Blizzard Beach and

Typhoon Lagoon), over thirty themed resort hotels, several non-Disney hotels, golf courses, and an outdoor shopping center (Disney Springs), all sitting on Disney-owned property covering approximately 25,000 acres.

8.      Furthermore, upon information and belief, this Court has personal jurisdiction over Disney because Disney has committed acts giving rise to Plaintiff's claims for patent infringement within and directed to this District.

9.      Upon information and belief, Disney has committed acts of infringement in this District and has one or more regular and established places of business within this District under the language of 28 U.S.C. § 1400(b). Thus, venue is proper in this District under 28 U.S.C. § 1400(b).

10.     Disney maintains a permanent and physical presence within the Central District of Florida, conducting business from Walt Disney World, including each of the parks and locations references above in Paragraph 7.

11.     Upon information and belief, Disney has conducted and does conduct substantial business in this forum, directly and/or through subsidiaries, agents, representatives, or intermediaries, such substantial business including but not limited to: (i) at least a portion of the infringements alleged herein; (ii) purposefully and voluntarily placing one or more infringing products or services into the stream of commerce with the expectation that they will be purchased and/or used by consumers in this forum; and/or (iii) regularly doing

4

or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Florida and in this judicial District.

12.     Venue is proper in the Central District of Florida pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b).

## THE PATENT-IN-SUIT

13.     This cause of action asserts infringement of United States Patent No. 7,212,983 ("the '983 Patent").

14.     The '983 Patent, entitled "Method and Apparatus for Providing Visitors with a Personalized Itinerary and Managed Access to Attractions," duly and legally issued on May 1, 2007, from U.S. Patent Application No. 09/858,376, filed on May 15, 2001, naming William Gibbens Redmann and Michael Anthony Eaton as co-inventors. The '983 Patent has a term extension under 35 U.S.C. § 154(b) of 1200 days. A true and correct copy of the '983 Patent is attached hereto as **Exhibit 1** and is incorporated by reference.

15.     The '983 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. *See infra*, ¶¶ 26–63.

16.     The '983 Patent is valid and enforceable under the United States Patent Laws.

17.    Plaintiff Agile Journeys is the owner and assignee of all rights, title, and interest in and under the '983 Patent.

18.    Assignments from the inventors to Agile Journeys were recorded with the United States Patent and Trademark Office on October 5, 2022 and appear beginning at Reel 061325, Frame 0806. A true and correct copy of the assignment is attached hereto a **Exhibit 2** and is incorporated by reference.

19.    Agile Journeys has standing to sue for infringement of the '271 Patent.

20.    The Inventors Mr. Redmann and Mr. Eaton are both former employees of Disney.

21.    Mr. Redmann worked for Disney at WED Enterprises for approximately two years as a show designer at EPCOT beginning in 1982. He later worked at Walt Disney Imagineering in Research and Development from approximately 1988 to 1993, where he developed new ride technologies. Mr. Redmann later worked as a Director of Technology for Walt Disney Imagineering and Disney Regional Entertainment from 1995 to 2000, where he worked designing and fielding DisneyQuest and developed and managed 18 high-technology attractions from inception through commercial deployment and operation.

22.    Mr. Redmann is a prolific inventor who is a named inventor or co-inventor on more than 80 issued United States Patents. Mr. Redmann is the named

inventor on at least twelve United States patents assigned to Disney, including

U.S. Patent No. 5,325,473 ("Apparatus and Method for Projection Upon a Three-

Dimensional Object"); U.S. Patent No. 5,329,310 ("Method and Apparatus for

Controlling Distortion of a Projected Image"); U.S. Patent No. 5,369,450

("Electronic and Computational Correction of Chromatic Aberration Associated

with an Optical System Used To View a Color Video Display"); U.S. Patent No.

5,392,735 ("Marine Mammal Communication Device"); U.S. Patent No. U.S. Patent

No. 5,403,238 ("Amusement Park Attraction"), U.S. Patent No. 5,407,391

("Negative Bust Illusion and Related Method"); U.S. Patent No. 5,583,844

("Programming Device and Method for Controlling Ride Vehicles in an

Amusement Attraction"); U.S. Patent No. 5,623,878 ("Dynamic Ride Vehicle");

U.S. Patent No. 5,633,993 ("Method and Apparatus for Providing a Virtual World

Sound System"); U.S. Patent No. 5,696,892 ("Method and Apparatus for Providing

Animation in a Three-Dimensional Computer Generated Virtual World Using a

Succession of Textures Derived from Temporally Related Source Images"); U.S.

Patent No. 6,007,338 ("Roller Coaster Simulator"); and U.S. Patent No. 6,309,306

("Interactive Entertainment Attraction Using Telepresence Vehicles").

23.    Mr. Eaton worked as a travel-industry marketing supervisor in the

Walt Disney Resort division from 1990 until 1997, where he packaged and

marketed Disney tourism products through various global wholesale and retail

7

distributors and supported general marketing campaigns of new Disneyland and Walt Disney World properties.

24.     Mr. Redmann and Mr. Eaton first met after both had left their employment at Disney and while they were working together at a company called HealthAllies. They worked at HealthAllies until early 2001.

25.     In the Spring of 2001, after leaving HealthAllies and years after leaving Disney, Mr. Redmann and Mr. Eaton began discussing solutions to problems they perceived in conventional theme park experiences. They conceived of solutions to these problems and reduced their solutions to writing, filing a patent application (U.S. Patent Application No. 09/858,376, which later issued as the '983 Patent) on May 15, 2001.

26.     The '983 Patent recognizes several problems with conventional technologies, including in particular technologies employed in theme parks. Traditionally, a party visiting a theme park could experience information overload from brochures featuring static lists of attractions, descriptions, showtimes, maps, restaurant options, etc. Deciding what to do first, where to go next, and how to plan a busy day in a crowded venue could be a very challenging task.

27.     The '983 Patent discusses some of these problems:

> A facility may contain many attractions. Individual rides, restaurants, exhibits, stores, shows, etc. are all part of the value a tourist can experience at a facility. Besides the individual attractions a facility might contain, a facility

> commonly provides collateral materials such as maps and show schedules.
>
> Too often, this collateral material hits the tourist with a barrage of comic book action balloons: "New!." "Must See." Pages and pages of tables showing services, menus, merchandise, age appropriateness, and heigh restrictions are presented in a dazzling array of color and iconography.
>
> Unfortunately, this frequently amounts to information overload. Its effect is compounded when a person is a first-time visitor, and again when they are from outside the primary marketing region of the facility (and so are unfamiliar with many of the facility's attractions), and again when there is the barrier of a language difference.

'983 Patent at 1:42–58.

28.     Itinerary generators existed at the time, but they were generally crude and lacked the functionality to be particularly useful for visitors. For example, itinerary generators of the era often required visitors to specify a list of destinations (*e.g.*, attractions such as rides, shows, and restaurants) before they would recommend an efficient route to visit them. Navigating a theme park with such an itinerary generator would require a visitor to research and learn about the park before being able to make an informed decision about what attractions the party should see. Once the generator performed its functions, the itinerary would be static.

29.     The '983 Patent discusses some of these traditional itinerary generators:

> Specialized, commercial systems have been developed to assist a tourist, or his travel agent, in preparing itineraries. Such systems collect from a prospective traveler a list of desired destinations. The system then sequences those destinations to produce an efficient outcome. An example of such software is TripMaker Deluxe 2000, by Rand McNally (Skokie, Ill.), and similar capabilities are available on their web site at www.randmcnally.com.

'983 Patent at 4:53–60.

30.     The '983 Patent describes improvements to traditional itinerary generation. For example, the '983 Patent discloses a system that collects information about a party (*e.g.*, the party's interests and abilities) and then provides a *personalized* itinerary based on how well each attraction matches the user's preferences. The personalized itinerary generator of the '983 Patent takes multiple variables into account, including how long it takes to walk between attractions, how long lines are expected to be, and whether the party has preferential access (*e.g.*, a virtual queue reservation). In this way, and in contrast to the traditional itinerary generators mentioned above, the system of the '983 Patent largely or completely obviates the need for a visitor to learn about the park in advance, while still providing the user with a way to enjoy a personalized selection of attractions and experiences. Additionally, the personalize itinerary generator can be dynamic, adjusting in real time to scheduling changes and unscheduled attraction closures, for example.

31.     The '983 Patent describes some of these features and advantages:

> The present invention relates to a system and method for creating a personalized itinerary for visitors to a facility, such as a zoo, theme park, historic area, or shopping district. In addition, the invention relates to a system and method that provides managed access to attractions at the facility.

'983 Patent at 6:11–15.

> To express their interests, and other party attributes, before beginning the visit in earnest, the party, or its representative, completes a profile.

'983 Patent at 6:20–22.

> If an itinerary is also generated to take into account the routing between attractions, it may allocate more time between events for parties whose profile indicates certain access limitations. That is, if a party requires access to an elevator or a route that avoids a particular steep grade, the route indicated may require more time.
>
> The itinerary can include in event timing a consideration of traffic for the party in transit, and for the queue length anticipated at the attractions. Such traffic and queue considerations can be variable by time (e.g. "rush hour" or a "lunchtime rush").
>
> The itinerary can adjust for a party's access class. Certain advantaged facility visitors may receive a "first class" or "VIP" preference.

'983 Patent at 7:51–65.

> It is an object of some embodiments of this invention to permit an itinerary to dynamically accommodate an interruption in the sequence of events. If a child in the party is suddenly ill, or if a diaper needs to be changed, or if some other distraction (a meal or another attraction)

> derails the party, the balance of the schedule can be recomputed, as described above.

'983 Patent at 9:37–43.

32. The '983 Patent also discusses the ability to adjust an itinerary if an attraction goes offline unexpectedly:

> It is an object of some embodiments of this invention to permit an itinerary to dynamically accommodate a missed event. For instance, if a party should become delayed and miss a showtime, or if an attraction should be unavailable because of unscheduled inoperation, the balance of the itinerary can be recomputed so that the party is minimally inconvenienced.

'983 Patent at 9:27–33.

33. The '983 Patent also discusses Disney's FASTPASS® system, recognizing problems in such virtual queue reservation systems. In particular, the '983 Patent notes that such systems required visitors to visit a kiosk or terminal to obtain a reservation for an attraction. Thus, while the system did reduce overall wait times, it favored experienced visitors over first-time or infrequent visitors.

34. The '983 Patent discusses prior art systems—including Disney's FASTPASS® system—and some of the advantages they provided:

> The Walt Disney theme parks make use of a system called FASTPASS® described by Laval et al. in U.S. Pat. No. 6,173,209. Visitors to a park can either enter the regular queue for an attraction, or they can obtain an express pass to use the express queue. The express pass has a time period during which it is valid. The visitor must present the express pass during the indicated time

period in order to bypass the queue and be admitted to the attraction. Obtaining an express pass is achieved by the visitor presenting an ID of some sort, to a kiosk near the ride. An express pass is issued, bearing the next available reservation time. No further express passes will be issued to an ID until the existing express pass has expired. Thus, a "first-come, first-served" virtual queue is created, and the visitor can be in only one virtual queue at a time.

Other systems for managing queue times allow visitors to select a series of attractions in order to make reservations. Mahoney et al. in U.S. Pat. No. 5,502,806 provides computer terminals for visitors having an ID to make and edit reservations. Turnstiles are equipped with ID readers and so can admit or deny admission to the visitor based on having a timely reservation on the attraction.

In both Laval et al. and Mahoney et al., visitors not having reservations are permitted to line up in a physical queue for the attraction. The attractions are configured with dual approaches. One is a long, physical queue suitable for the visitors who may be waiting over an hour for access to the attraction. The other is a relatively short queue having a gate that admits patrons whose reservations are current, and have thus been waiting in a virtual queue.

The advantage of virtual queuing is significant. While guests are waiting in a virtual queue, they can either be simultaneously enjoying other attractions, shop, or simply relax nearby.

35. The '983 Patent then discusses some of the disadvantages of these systems (discussed above):

A disadvantage of such systems, however, is that the visitor must either know to visit an attraction to claim a spot in the virtual queue (under Laval et al.) or they must know what attractions to select from the terminal (in

> Mahoney et al.) It may well be the case that a novice visitor has little or no idea where specific attractions are located (and thus is frustrated in trying to arrive in person to make a reservation). It can also be the case that he is not familiar with the array of attractions available, and thus cannot quickly and efficiently make knowledgeable attraction selections. Further, unless stringent restrictions are imposed, it can be the case that the reservations made by the overanxious visitor cannot actually be kept, as when two consecutive reservations are made for widely separated attractions.

'983 Patent at 2:53–3:35.

36.    The '983 Patent addresses this problem. For example, using a handheld device rather than a kiosk or other stationary terminal would allow a user to obtain reservations and display them to an operator or access control system without having to know the locations and wait times associated with the individual kiosks or terminals. Because automatic itinerary generation via the handheld device is based on the user's preferences—and not his or her familiarity with the facility—any relative disadvantage to first-time or infrequent visitors to the facility is greatly reduced.

37.    The '983 Patent discusses some of the key goals of the exemplary inventions, as well as some of the advantages achieved:

> A system or method is needed that allows an unfamiliar visitor to receive a near optimal experience, suited to his (or his party's) tastes, schedule, needs, and limitations. The experience should give a proper overview of the facility, so a tourist does not return feeling that they have missed a key element.

'983 Patent at 5:31–36.

> By this method, the entire collection of attractions can be
> ranked for each party by virtue of the ratings each
> attraction receives for the factors in the party's profile.
> That is, first a party, or its representative, completes a
> profile. Next, the rating is determined for each attraction
> in the facility from the factors comprising the party's
> profile. The attractions can be ranked from high to low,
> based on the rating thus derived.

'983 Patent at 7:24–30.

> The method of the present invention can be implemented
> using a general purpose computer, or a portable
> handheld computer, or as an Internet or other network
> based service. The preferred embodiment uses a portable
> handheld computer, for example, those which
> implement the Palm OS by Palm Inc. (Santa Clara, Calif.).
> This preferred embodiment is described first below.

'983 Patent at 10:44–50.

> In the special case of current event attraction name **430**,
> touching it may optionally bring up a pass form **600**,
> showing a reservation or access permission. Such a pass
> is shown in FIG. **6**. The exact nature of the pass will
> depend on the operation procedures instituted by the
> facility operators.

'983 Patent at 14:59–64.

> In an embodiment where itinerary **1500** is generated by
> a computer having communication access to a
> reservation computer (for example, if the portable
> computer **100** has a wireless network capability), and the
> reservation computer is operated by or for a dining
> establishment, then an additional capability is created.
> The itinerary generating computer can request a
> reservation at the restaurant for the time of an event

being considered in the itinerary. Prior to requesting the reservation, the attraction evaluation loop of steps **1440**, **1450**, and **1460** will have determined that if a reservation were to be available from this restaurant at (or near) this time, then dining at this restaurant would be the most desirable event available. If the reservation is available, then the event is entered into the itinerary and the reservation is kept. If the reservation is not available, then an attempt may be made to obtain a reservation at a different restaurant that would result in the next most desirable event. By ordering the requests for reservations from most desirable to least, the first reservation that is available is automatically the most desirable event possible.

'983 Patent at 30:19–39.

38.    The '983 Patent further recognizes that conventional guided tours, brochures, and virtual queue reservation systems all fail to help operators redistribute unequal demand for attractions.

39.    The '983 Patent states as one desired goal of the invention:

Similarly, a system is needed that will diffuse demand for attractions within a facility so that excessive demand, perhaps time-of-day dependent demand, or lack thereof, can be moderated.

'983 Patent at 6:1–4.

40.    The '983 Patent further states:

A system is needed that will redistribute demand for attractions in a facility—to moderate demand for popular (i.e., 'E') attractions and create demand for other, underutilized attractions.

'983 Patent at 5:64–67.

41.     To address these issues, the '983 Patent proposes improvements to the technology of itinerary generation that allow a theme part to spread demand for its attractions through mechanisms that moderate demand for popular attractions and create demand for underutilized attractions.

42.     The '983 Patent discusses these objects of the exemplary system:

> It is an object of this invention to permit a facility operator to diffuse demand for attractions within the facility.

'983 Patent at 9:50–51.

> One way of insuring that the allocated capacity of an attraction is not exceeded by itineraries generated which include that attraction, is to centrally manage itinerary generation. As the attraction capacity allocated to a visitor class during an interval is approached, a synthetic aversion factor is increased which lowers the desirability of inserting an event into an itinerary having a time in that interval for that attraction. When the capacity for an attraction during a particular interval has been reached, the synthetic aversion factor is such that the attraction is utterly undesirable.

> In the preferred embodiment, no central database is employed. Instead, from a list of attractions expected to have demand beyond allocated capacity, a random selection process determines which attractions will be given a synthetic aversion factor. The aversion factor will be scaled according to the degree by which excessive demand is expected. This will be most appropriate to attractions where the capacity allocation is soft, since any statistical fluctuation in demand over many generated itineraries will be absorbed by the regular queue.

'983 Patent at 23:28–47.

> It will be recognized that other functions, perhaps driven by usage data, attraction capacity, or other accumulated information can be constructed and used to diffuse or moderate demand.

'983 Patent at 25:12–15.

43.     Another shortcoming in traditional itinerary generators and virtual queue reservation systems was the inability to combine the primary functionality with marketing opportunities and recommendations.

44.     The '983 Patent discusses this goal of the invention:

> It is further an object of this invention to present marketing promotions to a party, to promote certain venues or the sale of certain merchandise, at times when a party is proximal to it, or the promotion is otherwise deemed appropriate. It may be a factor incorporated in the party's profile whether such marketing promotions are presented.

'983 Patent at 9:16–21.

45.     Thus, the solutions described and claimed in the '983 Patent provide improvements over conventional theme park navigation, planning, and virtual queue reservation systems that required prior knowledge of park facilities, advantaged visitors familiar with the park, failed to offer recommendations or marketing when suitable, and/or provided only static, inflexible itineraries to users.

46.     Given the state of the art at the time of the inventions described and claimed in the '983 Patent—including the deficiencies in both traditional itinerary

generation and virtual queue reservation systems discussed above — the inventive concepts described and claimed in the '983 Patent cannot be considered conventional, well-understood, or routine. The '983 Patent provides an unconventional solution to problems arising in the context of itinerary generation and virtual queue reservation systems. In particular, the '983 Patent describes and claims a system that can collect information about the party to generate a personalized itinerary, where the itinerary can be dynamic, where the itinerary can moderate demand for popular attractions and create demand for underutilized attractions, and where the itinerary can include recommendations and marketing at appropriate times.

47. It was not well-understood, routine, or conventional at the time of the inventions described and claimed in the '983 Patent to have a system for providing a customized itinerary to a party based on information about the party and data regarding available attractions.

48. A prototype application file for the Palm line of handheld computers was created as a sample embodiment of at least some of the inventions described and claimed in the '983 Patent. For example, a file called "Assistant.prc" ("Assistant Application") appears when loaded on a Palm III or newer model Palm OS device.

49.     Below is a picture of the display of a Palm IIIc device with the Assistant Application installed:



50.     When launched on a Palm device, the Assistant Application was pre-loaded with data regarding 17 theme park attractions at Universal Studios Hollywood Theme Park as of approximately March 30, 2001. The following picture shows the splash screen for the Assistant Application:



51.     The prototype of the Assistant Application included data about each attraction, including attraction name and description, entrance and exit locations (as nodes in a map), opening time, queue closing time, attraction duration, an attraction closed flag, a list of showtimes (if the attraction had discrete showtimes), queue duration (which differed for lightly vs. heavily attended days and by admission class (VIP or regular)), acceptance factor flags (*e.g.*, violence, loud, wet, kiddie, height limit, wheelchair transfer required, bores kids), and a logo for the attraction.

52.     A Palm device running the Assistant Application would collect information about a party, including the party's composition, entitlements, plans, preferences, and would distinguish among attractions with reference to the data.

53.     The images below are pictures of information gathering screens on a Palm IIIc device running the Assistant Application:









 

54.     The Palm device running the Assistant Application would then construct a customized itinerary based on the data regarding attractions and information about the party, the attractions included in the itinerary comprising at least some of the attractions for which the data substantially matched the information.

55.     The image below is a sample custom itinerary created by the prototype Assistant Application and displayed on a Palm IIIc device:



56.     The Assistant Application caused a scrolling display to appear on the Palm device, which displayed the customized itinerary for the party.

57.     The image below is a picture of the custom itinerary depicted in paragraph 55 after scrolling to the bottom:



58.     The custom itineraries created by the Assistant Application could also display tickets or attraction passes, as shown in the image below:

24



59.     The custom itineraries created by the Assistant Application could also include gap times (*e.g.*, "<Take 0:37>" in the left image below). When a user clicked on such an event, the Assistant Application would provide suggested activities for the user to do before the next scheduled event. The second image below shows a place-holder screen depicting this feature:

 

60.    The Assistant Application also included a mock-up dining notice, which would be used, *e.g.*, to notify a party when their table was ready at a restaurant:



61.    The Assistant Application's "About Assistant Director" page referred to the application as "a demonstration application using patent pending technology." It also identified Bill Redmann and provided his telephone number.

62.    The image below is a picture of the "About Assistant Director" page of the Assistant Application as displayed on a Palm IIIc device:



63.    The Assistant Application was in development while the application that led to the '983 Patent was being drafted. Screen captures made from an early version of the Assistant Application running on a software emulation of a Palm device were the basis of Figures 1–6 of the '983 Patent.

64.    Disney has not obtained a license to the '983 Patent.

65.    Disney does not have Agile Journeys's permission to make, use, sell, offer to sell, or import products or services that are covered by one or more claims of the '983 Patent or to perform any methods claimed in the '983 Patent.

66.    Disney needs to obtain a license to the '983 Patent and cease its ongoing infringement of Agile Journeys's patent rights.

## GENERAL ALLEGATIONS

67.    Upon information and belief, Disney makes, uses, sells, offers to sell, and/or provides to customers methods and systems for providing visitors with a

personalized itinerary and managed access to attractions as claimed in the '983 Patent. For example, and without limitation, Disney provides for use by its theme park customers the Disney Genie service and the Disney Genie+ service, including servers and one or more downloadable applications for mobile devices (including at least the My Disney Experience mobile application and/or the Disneyland mobile application (featuring the Disney Genie and/or Disney Genie+ features) for iOS and Android devices) (collectively, "Disney Genie").

<u>**Overview of the Accused Products**</u>

68.    Disney maintains a website that describes the Disney Genie service.

69.    Disney's website states, in part:

## You've Never Had a Friend Like This!

Introducing Disney Genie service and Disney Genie+ service, conveniently built into the My Disney Experience mobile app. Once you log into your Disney account, these services magically make your theme park visit easier and more fun. It's like having your own personal genie in the palm of your hand.

Whether you're a first-timer or a seasoned pro, Disney Genie service can help you get the most of your visit to Walt Disney World Resort.

**Watch short, helpful videos about Disney Genie service and Disney Genie+ service. >**

*www.disneyworld.disney.go/com/genie/*

70.    The website represents that the Disney Genie service provides "a personalized itinerary creator that seamlessly and smartly maps out your visit with updates that continue from morning to night":

## Wish in the Moment

Our complimentary Disney Genie service creates your best Disney day inspired by your party's top interests. It also grants you new planning features, including a personalized itinerary creator that seamlessly and smartly maps out your visit with updates that continue from morning to night. And, Disney Genie service can even remind you when you're eligible to make dining and activity reservations in advance.

*www.disneyworld.disney.go/com/genie/*

71.    The Disney website describes the "Personalized Daily Itinerary" enabled by the Disney Genie service:

## A Personalized Daily Itinerary

Disney Genie service works hard all day long to continuously update your "My Day" itinerary with all of the latest and greatest information. Simply tap on this tab to find Disney Genie service recommendations and plans you've made, including dining reservations, Disney Resort hotel reservations and activity bookings. You'll also be able to virtually chat with a Cast Member who can help answer any questions that arise.

**Watch a short, helpful video about Tip Board and My Day.** ›

*www.disneyworld.disney.go/com/genie/*

72.     Avery Maehrer, Manager of Communications for Walt Disney World Resort, describes the Disney Genie service in part as follows:

> Built right into the My Disney Experience and Disneyland apps, Disney Genie service will maximize your park time, so you can have more fun. It includes a personalized itinerary feature that will quickly and seamlessly map out an entire day. From specific attractions, foodie experiences and entertainment, to general interests like Disney princesses, villains, Pixar, *Star Wars*, thrill rides and more – just tell Disney Genie what you want to do and it will do the planning for you.

Avery Maehrer, "Disney Genie Service to Reimagine the Guest Experience at Walt Disney World Resort and Disneyland Resort," Walt Disney World Resort Stories (August 18, 2021), *available at* https://disneyparks.disney.go.com/blog/2021/08/introducing-disney-genie/.

73.     Disney Genie was announced at the D23 Expo 2019.

74.     Speaking at the D23 Expo 2019, Bob Chapek stated about the Disney Genie service:

> Disney Genie has capabilities that can help make the most out of your visit, whether you're a first-time guest or a seasoned pro. It will put customized itineraries geared towards your interests at your fingertips, cutting down on the need to plan and research.

The DIS, "Disney Genie Announcement | D23 Expo 2019," YouTube Video at 0:32–0:55 (Aug. 25, 2019), *available at* https://www.youtube.com/watch?v=nQ1YD_TWvew.

75.     Disney touts the flexibility of the Disney Genie service, stating on its website that it "will continue to offer new suggestions throughout the day, so you can make the most of your time during your visit":

## Tailored Recommendations

You'll receive attraction and dining recommendations inspired by what you told Disney Genie service you're most interested in doing. It even suggests a good time to go to an experience and an idea of the forecasted wait. Need to swap out an option? No problem. Disney Genie service will continue to offer new suggestions throughout the day, so you can make the most of your time during your visit.

*www.disneyworld.disney.go.com/genie/*

76.     Mr. Chapek also referenced this flexibility during his announcement of the Disney Genie service at the D23 Expo 2019, stating:

> And, best of all, it's all flexible. If you change your wish for any reason during the day, Disney Genie will help re-optimize your day. It will even send you real-time tips and updates including recommendations for experiences that it thinks you'll love. And for those who don't want to worry about making dining and FastPass reservations in multiple steps, Genie will take care it for you.

The DIS, "Disney Genie Announcement | D23 Expo 2019," YouTube Video at 1:22–1:46(Aug. 25, 2019), *available at* https://www.youtube.com/watch?v=nQ1YD_TWvew.

77.     The Disney Genie service also provides an interactive map that is customized to the user's personalized itinerary generated by the Disney Genie service:



*www.disneyworld.disney.go.com/genie/*



*www.disneyworld.disney.go/com/genie/*

78.     Upon information and belief, the Disney Genie service collects information about a party's size, membership, and entitlements:



BlogMickey, "How to Enroll in the Disney Genie Service," posted October 14, 2021, *available at* https://blogmickey.com/2021/10/how-to-enroll-in-disney-genie/.

79.    According to the blog post referenced above, "After you've selected your date, park, and party, you'll be asked to select your must-do attractions and experiences." *See id*.

80.    Upon information and belief, among the information the Disney Genie service obtains for purposes of customizing an itinerary to a particular user or party are preferences related to height requirements and accessibility concerns:



Tom Bricker, "Review: Disney World's Free Genie Itinerary Creator,"

DisneyTouristBlog, *available at* https://www.disneytouristblog.com/review-

disney-world-free-genie-itinerary-customizer/.

      81.    Upon information and belief, the Disney Genie service allows users

to specify the total time they plan to be at individual parks so the service may use

the information to tailor an itinerary to optimize the user's day:



Shannen Michaelsen, "GUIDE: Park Hopping With Disney Genie at Walt Disney World," WDW News Today (October 19, 2021), *available at* https://wdwnt.com/2021/10/guide-park-hopping-with-disney-genie-at-walt-disney-world/.

82.    Upon information and belief, the Disney Genie service also collects information about a party's preferred themes (*e.g.*, princesses, villains) different types of attractions (*e.g.*, thrill, slow), and dining:



BlogMickey, "How to Enroll in the Disney Genie Service," posted October 14, 2021, *available at* https://blogmickey.com/2021/10/how-to-enroll-in-disney-genie/.

## <u>Overview of Infringement Allegations</u>

83.    Disney has infringed and continues to infringe (literally and/or under the doctrine of equivalents), directly, indirectly, and/or through subsidiaries, agents, representatives, or intermediaries, one or more claims of the '983 Patent by making, using, testing, supplying, causing to be supplied, selling, and/or offering for sale in the United States the Disney Genie system, including the Disney Genie App.

84.    Agile Journeys has been and continues to be damaged as a result of Disney's infringing conduct. Disney is therefore liable to Agile Journeys in an amount that adequately compensates Agile Journeys for Disney's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

85.    Additionally, upon information and belief, Disney markets, sells, and/or uses other products and services that are not covered by the claims of the '983 Patent but that are used or offered with the Disney Genie program and/or that benefit Disney in ways at least attributable in part to the Disney Genie program. Accordingly, Agile Journeys is entitled to collect damages from Disney for convoyed sales of certain non-patented products and services.

86.     Disney failed to obtain permission from Agile Journeys to make, use, sell, offer to sell, and/or import products or services incorporating the inventions claimed in the '983 Patent.

### Disney's Knowledge of the '983 Patent

87.     Disney has had actual knowledge of Mr. Redmann since before the filing of this complaint.

88.     Disney has had actual knowledge of Mr. Eaton since before the filing of this complaint.

89.     Disney has had actual knowledge of the inventions described in the '983 Patent since before the filing of this complaint.

90.     Disney has had actual knowledge of the application that led to issuance of the '983 Patent since before the filing of this complaint.

91.     Disney has had actual knowledge of the '983 Patent since before the filing of this complaint.

92.     Mr. Redmann contacted Disney on multiple occasions between January 3, 2002, and August 20, 2002, after the filing of the application that led to the '983 Patent.

93.     Mr. Redmann sent an e-mail to Kyle Hanley on January 3, 2002. At the time, Mr. Hanley was a Director of Media Development and Operations at

Walt Disney Parks and Resorts. A true and correct copy of the e-mail from Mr. Redmann to Mr. Hanley is attached as **Exhibit 3**.

94.     The e-mail referenced in paragraph 93 provided an overview of some of the features and functionalities of the invention conceived by Mr. Redmann and Mr. Eaton and that is described and claimed in the '983 Patent.

95.     Upon information and belief, Mr. Hanley received the e-mail referenced in paragraph 93.

96.     Upon information and belief, Mr. Hanley read the e-mail referenced in paragraph 93.

97.     Mr. Redmann sent an e-mail to Andy Schwalb on July 18, 2002. At the time, Mr. Schwalb was Director of Wald Disney World IT's New Technology Group. A true and correct copy of the e-mail from Mr. Redmann to Mr. Schwalb is attached as **Exhibit 4**.

98.     The e-mail referenced in paragraph 97 also copied Teresa Lee and Kyle Hanley.

99.     The e-mail referenced in paragraph 97 provided an overview of some of the features and functionalities of the invention conceived by Mr. Redmann and Mr. Eaton and that is described and claimed in the '983 Patent.

100.     Upon information and belief, Mr. Schwalb received the e-mail referenced in paragraph 97.

101.    Upon information and belief, Mr. Schwalb read the e-mail referenced in paragraph 97.

102.    Upon information and belief, Ms. Lee received the e-mail referenced in paragraph 97.

103.    Upon information and belief, Ms. Lee read the e-mail referenced in paragraph 97.

104.    On August 13, 2002, Ms. Lee faxed a letter (referred to on the fax cover sheet as a "Ground Rules Letter") signed by Mr. Schwalb and dated August 6, 2002, to Mr. Redmann. A true and correct copy of the letter with the fax cover page is attached as **Exhibit 5**.

105.    The letter referenced at paragraph 104 stated, in part, "We look forward to having the conference call with you on August 14, 2002 to discuss what your company can do to help our company reduce costs and improve customer and/or employee experience."

106.    Mr. Redmann signed the letter referenced at paragraph 104 and returned a copy to Mr. Schwalb.

107.    Mr. Schwalb and Mr. Redmann had a telephone conference call on August 14, 2002.

108.    During the phone call referenced at paragraph 107, Mr. Redmann and Mr. Schwalb discussed the invention conceived by Mr. Redmann and Mr. Eaton and discussed the pending patent application that later issued as the '983 Patent.

109.    After the phone call referenced at paragraph 107, Mr. Redmann e-mailed Mr. Schwalb. In the e-mail Mr. Redmann described a package of materials he planned to send to Mr. Schwalb to review. A true and correct copy of the e-mail is attached as **Exhibit 6**.

110.    On August 20, 2002, Mr. Redmann provided Mr. Schwalb with the package via e-mail, which included "the information you requested" attached to the e-mail as five files, the icons of which are visible on the second page of the e-mail. A true and correct copy of the e-mail is attached as **Exhibit 7**.

111.    Mr. Hanley was copied on the e-mail referenced in paragraph 110.

112.    Pursuant to the e-mail referenced in paragraphs 109 and Mr. Schwalb's request, the e-mail referenced in paragraph 110 contained five files as attachments: a description of each file (attached hereto as **Exhibit 8**), a presentation discussing the benefits of the invention and revenue opportunities introduced by the technology (attached hereto as **Exhibit 9**), the first 24 pages of the application that led to the '983 Patent (attached hereto as **Exhibit 10**), exemplary screen shots and sample itineraries (attached hereto as **Exhibit 11**), and a working version of the Assistant Application (discussed above in paragraphs 48–63) to run on a Palm

III computer. **Exhibits 8–11** contain true and correct copies of some of the materials that were included in the package Mr. Redmann sent to Mr. Schwalb.

113.   The working version of the Assistant Application that Mr. Redmann sent to Mr. Schwalb was Version 0.2 of the Assistant Application.

114.   Upon information and belief, Mr. Schwalb received the package of materials referenced at paragraph 112.

115.   Upon information and belief, Mr. Schwalb viewed the contents of the package of materials referenced at paragraph 112.

116.   Upon information and belief, Mr. Hanley viewed the contents of the package of materials referenced at paragraph 112.

117.   Disney had actual knowledge of the invention described in the '983 Patent as a result of Mr. Redmann's correspondence with Mr. Schwalb.

118.   Disney had actual knowledge of the application that led to the '983 Patent as a result of Mr. Redmann's correspondence with Mr. Schwalb.

119.   The '983 Patent was cited as prior art to one or more patent applications filed by or on behalf of Disney.

120.   On February 22, 2008, Disney filed United States Patent Application No. 12/036,176, titled "Method, System and Computer Program Product for Providing Real-Time Recommendations" ("'176 Application").

121.    According to the Application Data Sheet filed with the '176 Application, the assignee was "Disney Enterprises, Inc.," which is a subsidiary of TWDC.

122.    On March 4, 2011, the examiner rejected all the pending claims in the '176 Application under 35 U.S.C. § 103 as being unpatentable over the '983 Patent in view of various other references.

123.    After a response and amendment by the applicant, the examiner issued a Final Rejection on July 29, 2011, again rejecting all pending claims under 35 U.S.C. § 103 as being unpatentable over the '983 Patent in view of various other references.

124.    The applicant filed an appeal brief on December 29, 2011.

125.    The examiner filed a response to the appeal brief on February 16, 2012.

126.    The applicant filed a reply in support of the appeal brief on April 16, 2012.

127.    On March 25, 2015, the PTAB affirmed the examiner's rejection of all pending claims over the '983 Patent in view of other references.

128.    Disney had actual knowledge of the '983 Patent through its prosecution activities related to the '176 Application.

129.    On November 17, 2008, Disney filed United States Patent Application No. 12/313,227, titled "System and Method for Providing a Rich Media Visitor Log" ("'227 Application").

130.    According to the Application Data Sheet filed with the '227 Application, the assignee was "Disney Enterprises, Inc."

131.    On January 23, 2009, Disney submitted an Information Disclosure Statement in connection with prosecution of the '227 Application. Among the prior art references cited in the Information Disclosure Statement was U.S. Patent Application Publication No. 2002/0174003, which corresponds to the '983 Patent.

132.    The '227 Application issued as United States Patent No. 8,428,509 on April 23, 2013.

133.    Disney had actual knowledge of the '983 Patent as shown by its prosecution activities related to the '227 Application.

134.    On April 22, 2011, Disney filed United States Patent Application No. 13/092,370, titled "Managing Experience State to Personalize Destination Visits" ("'370 Application").

135.    According to the Application Data Sheet filed with the '370 Application, the assignee was "Disney Enterprises, Inc."

136.   On January 4, 2013, the examiner rejected all the pending claims in the '370 Application under 35 U.S.C. § 102 as being anticipated by the '983 Patent. The '983 Patent was the only prior art reference cited in the office action.

137.   After a response and amendment by the applicant, the examiner issued a Final Rejection on April 15, 2013, again rejecting all pending claims under 35 U.S.C. § 102 as being anticipated by the '983 Patent. The '983 Patent was the only prior art reference substantively discussed in the office action.

138.   The applicant appealed the examiner's final rejection, and the PTAB reversed the examiner on appeal.

139.   The '370 Application issued as United States Patent No. 9,367,852 on June 14, 2016.

140.   Disney had actual knowledge of the '983 Patent through its prosecution activities related to the '370 Application.

141.   Notwithstanding Disney's knowledge of the '983 Patent, Disney has knowingly or with reckless disregard willfully infringed the '983 Patent. Disney has acted despite an objectively high likelihood that its actions constituted infringement of the '983 Patent.

142.   The objective risk that Disney infringed the '983 Patent was known or so obvious that it should have been known to Disney.

143.    Upon information and belief, Disney directly copied the inventions described and claimed in the '983 Patent when developing the Disney Genie service.

## COUNT I – INFRINGEMENT OF THE '983 PATENT

144.    Agile Journeys incorporates by reference the allegations made in paragraphs 1–143.

145.    Disney has been and is now directly infringing the '983 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing into the United States the Disney Genie system, which is covered by and/or practices the methods described in one or more claims of the '983 Patent, including but not limited to Claim 1.

146.    Additionally, Disney has been and is now indirectly infringing the '983 Patent in violation of 35 U.S.C. § 271(b) by inducing its customers (*i.e.*, visitors to its theme parks) to use the Disney Genie system, which itself constitutes direct infringement of the systems and methods described in one or more claims of the '983 Patent, including but not limited to Claim 1. Disney has knowingly and intentionally induced its customers to directly infringe one or more claims of the '983 Patent at least by (1) providing instructions or information, for example on its publicly available website, to explain how to use the Disney Genie service; and (2) touting these uses of the Disney Genie service in advertisements, including but not

limited to, those on Disney's websites.  Use of the Disney Genie service in the manner intended and/or instructed by Disney necessarily infringes one or more claims of the '983 Patent, including at least Claim 1.

147.   Additionally, Disney has been and is now indirectly infringing the '983 Patent in violation of 35 U.S.C. § 271(c) by providing material components of the inventions claimed in the '983 Patent with knowledge of the '983 Patent. Upon information and belief, the Disney Genie service is designed for a use that is both patented and infringing and that has no substantial non-infringing use and is not a staple article of commerce.

148.   An  exemplary  claim  chart  comparing  Disney's  infringing systems/methods to one or more claims of the '983 Patent is attached as **Exhibit 12** and is incorporated by reference as if fully set forth herein.

149.   Disney's infringement of the '983 Patent has been and is willful.

150.   As a result of Disney's infringement of the '983 Patent, Agile Journeys has suffered and is owed monetary damages that are adequate to compensate it for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

**DEMAND FOR A JURY TRIAL**

151.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Agile Journeys demands a trial by jury on all issues triable of right by a jury.

## PRAYER FOR RELIEF

152.   WHEREFORE, Agile Journeys respectfully requests that this Court enter judgment in its favor and grant the following relief:

a.      a judgment that Disney has directly infringed one or more claims of the '983 Patent under 35 U.S.C. § 271(a);

b.      a judgment that Disney has indirectly infringed one or more claims of the '983 Patent under 35 U.S.C. § 271(b);

c.      a judgment that Disney has contributorily infringed one or more claims of the '983 Patent under 35 U.S.C. § 271(c);

d.      a judgment and order requiring Disney to pay Agile Journeys past and future damages under 35 U.S.C. § 284, including for supplemental damages arising from any continuing post-verdict infringement for the time between trial and entry of the final judgment with an accounting, as needed, as provided by 35 U.S.C. § 284;

e.      a judgment that Disney's infringement has been and is willful;

f.      a judgment and order requiring Disney to pay Agile Journeys enhanced damages for its willful infringement;

g.      a judgment and order requiring Disney to pay Agile Journeys reasonable ongoing royalties on a going-forward basis after final judgment;

h.    a judgment and order requiring Disney to pay Agile Journeys pre-judgment and post-judgment interest on the damages award;

i.    a judgment and order requiring Disney to pay Agile Journeys's costs;

j.    a judgment and order declaring this case exceptional under 35 U.S.C. § 285;

k.    a judgment and order requiring Disney to pay Agile Journeys's reasonable attorneys' fees; and

l.    such other and further relief as the Court may deem just and proper.

Dated:    December 2, 2022        Respectfully submitted,

\_\_/s/Steven G. Koeppel\_\_\_\_
**STEVEN G. KOEPPEL**
Florida State Bar No. 602851
**YESLOW, KOEPPEL & ANDERSON P.A.**
1617 Hendry Street, Suite 205
Fort Myers, Florida 33901
239.337.4343 (telephone)
239.337.5762 (facsimile)
steve@yklegal.com

**ANTHONY K. BRUSTER**
*Pro Hac Vice Application to be filed*
**SHAWN A. LATCHFORD**
*Pro Hac Vice Application to be filed*
**ANDREW J. WRIGHT**

*Pro Hac Vice Application to be filed*
**BRUSTER PLLC**
680 North Carroll Avenue, Suite 110
Southlake, Texas 76092
817.601.9564 (telephone)
817.296.2929 (facsimile)
akbruster@brusterpllc.com
shawn@brusterpllc.com
andrew@brusterpllc.com

**JAY P. KESAN**
*Pro Hac Vice Application to be filed*
**CECIL E. KEY**
*Pro Hac Vice Application to be filed*
**KEY IP LAW, PLLC**
1934 Old Gallows Road, Suite 350
Vienna, Virginia 22182
703.752.6276 (telephone)
jay@keyiplaw.com
cecil@keyiplaw.com

**COUNSEL FOR PLAINTIFF
AGILE JOURNEYS LLC**